Crystal Foley (SBN 224627)
cfoley@simmonsfirm.com
**SIMMONS HANLY CONROY LLC**
100 N. Sepulveda Blvd., Suite 1350
Los Angeles, CA 90245
Phone: (310) 322-3555

Greg F. Coleman*
greg@gregcolemanlaw.com
**GREG COLEMAN LAW PC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080; Fax: (865) 522-0049

Daniel K. Bryson*
Dan@wbmllp.com
J. Hunter Bryson*
Hunter@wbmllp.com
**WHITFIELD BRYSON & MASON LLP**
900 W. Morgan St.
Raleigh, NC 27603
Tel: 919-600-5000; Fax: 919-600-5035
*pro hac vice to be submitted*

*Attorneys for Plaintiffs*
*Additional attorneys on signature page*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JASON BLISSARD and SHANE REDMAN** on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> **FCA US LLC,** <br><br> Defendant. | Case No. _____ <br><br><br> **CLASS ACTION COMPLAINT** <br> **WITH JURY DEMAND** |

**CLASS ACTION COMPLAINT**

Plaintiffs Jason Blissard and Shane Redman ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through the undersigned counsel, bring this Class Action Complaint against Defendant FCA US LLC ("FCA"). Plaintiffs allege the following based upon personal knowledge as to their own acts, and based upon the investigation conducted by their counsel as to all other allegations:

**NATURE OF THE CASE**

1. This action concerns FCA's refusal to honor its warranty and cover the cost of repairing a defect in the engines of FCA's Jeep Wrangler model years 2012-2017 (collectively, "Jeeps" and "Class Vehicles").

2. At the point of sale, Class Vehicles suffer from a defect (hereinafter referred to as the "Defect") in the engine's heating and cooling system (hereinafter referred to generally as the "Cooling System"). Upon information and belief, the Defect consists of a reaction between the manufacturer-installed coolant and the aluminum components in the engine, namely those comprising the Cooling System. Upon information and belief, the Defect can be exacerbated by the presence of flux left over from fabrication of the radiator. The Defect results in the build-up of sludge within the heater core and other components of the Cooling System.

3. Early in its investigation of the Defect, FCA and its dealerships identified various suspected contaminants in the sludge as potentially consisting of casting sand and/or welding flux, a characterization that was subsequently shared with service departments. This information was informally relayed to a limited number of consumers and became a common explanation of the problem that many Class Vehicle

owners were experiencing. These types of contaminants tend to exacerbate the problem rather than causing the sludge to buildup in the first place.

4.     The buildup of sludge causes the Class Vehicles' Cooling Systems to malfunction and fail. Specifically, the Defect causes damage to the heater core and other components of the Cooling System, impairing the Class Vehicles' heating, cooling, and defrost functions.

5.     FCA knew or should have known about the Defect from pre-sale testing of the Class Vehicles before the sale of the first Class Vehicle in late 2011. Moreover, hundreds of publicly-available consumer complaints, as well as FCA's own records, identify the large scope of the heating and cooling failures, giving FCA notice of the pervasiveness of the Defect as early as June 2012.

6.     Even after learning of the Defect, FCA did not disclose it to potential purchasers or lessees through its advertising, marketing materials, dealer communications or through any other means to potential buyers prior to their purchases. Instead, FCA continued to sell Class Vehicles without disclosing the Defect that was present at the point of sale. As a result, Plaintiffs and the Class did not receive the benefit of their bargain in that had they been advised of the Defect at the point of sale, they either would not have purchased their vehicles or would have paid less for them than they did.

7.     FCA also did not disclose the Defect to owners or lessees of Class Vehicles after their purchases, such as when they brought their Class Vehicles into FCA dealerships for repairs that were directly related to the Defect.

8.     Every Class Vehicle was sold or leased pursuant to express and implied warranties, including a "New Vehicle Limited Warranty" that provides "bumper to bumper coverage for three years or 36,000 miles" and a Powertrain Limited Warranty

that covers the cost of all parts and labor needed to repair a powertrain component – including the engine – that is defective in workmanship and materials within five years or 100,000 miles, whichever occurs first, calculated from the start date of the New Vehicle Limited Warranty. The New Vehicle Limited Warranty begins on the date a purchaser takes delivery of the vehicle or the date when the vehicle was first put into service, whichever is earlier.

9.     Plaintiffs and other Class Vehicle owners and lessees similarly situated (the "Class" or "Class Members") have requested that FCA or its authorized dealers repair and/or replace any vehicle components damaged as a result of the Defect, but it refuses to fully cover the costs of parts, labor, and repair. Instead, FCA states either that the warranty does not cover the repair because the heater core failure was created by "external factors" such as owner "misuse," or that the warranty period had elapsed.

10.     Plaintiffs bring claims for breach of express warranties, breach of the Magnuson-Moss Warranty Act, breach of implied warranties, breach of Song-Beverly Implied Warranty Act, negligence, unjust enrichment, breach of the California Consumer Legal Remedies Act, and breach of all three prongs of the California Unfair Competition Law. Plaintiffs and the Class seek to recover damages they incurred as a result of FCA's failure to inform Plaintiffs and the Class about the Defect, and its failure to repair or replace engine and/or Cooling System components damaged as a result of the Defect. Moreover, Plaintiffs and the Class also seek a declaration that the Defect should be covered under the Powertrain Warranty and/or an extension of the New Vehicle Limited Warranty to cover repair of the components damaged as a result of the Defect. Finally, Plaintiffs request an injunction mandating that FCA inform owners and lessees of the Class Vehicles of the Defect.

11.    Plaintiffs also seek attorney's fees and costs, pre- and post-judgment interest, and all other remedies and relief as may be permitted by law.

## THE PARTIES

12.    Plaintiff Jason Blissard, proposed Class representative, is a citizen of the State of California, residing in Ventura County, California.

13.    Plaintiff Shane Redman, proposed class representative, is a citizen of the State of California, residing in Los Angeles County, California.

14.    Defendant FCA US LLC is a Delaware limited liability company with its headquarters in Auburn Hills, Metro Detroit, Michigan.

## JURISDICTIONAL ALLEGATIONS

15.    United States District Court for the Central District of California has original subject matter jurisdiction over this matter pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the proposed Class exceeds one hundred members, the aggregate amount in controversy (excluding interest and costs) exceeds $5,000,000.00, and there is the requisite degree of diversity of citizenship between the parties.

16.    The United States District Court for the Central District of California also has original subject matter jurisdiction over the Magnuson-Moss Warranty Act claim, 15 U.S.C. § 2301, pursuant to 28 U.S.C. § 1331.

17.    The United States District Court for the Central District of California can exercise supplemental jurisdiction over the Class's state law claims under 28 U.S.C. § 1367.

18.    The United States District Court for the Central District of California can exercise personal jurisdiction over FCA because it has regular and systematic contacts

with the state of California, in which it does business and places Class Vehicles into the stream of commerce.

19.    The United States District Court for the Central District of California is a proper venue for this action, pursuant to 28 U.S.C. § 1391(b)(1), because FCA is subject to personal jurisdiction in this District, the sale of some of the Plaintiffs' Class Vehicles occurred in this District, and such sales gave rise to this action.

## THE DEFECT

20.    The power plant in Class Vehicles is a Pentastar V6 3.6 Liter engine (hereinafter "Pentastar"). Pentastar engines contain aluminum components. Beginning in 2011 when the Class Vehicles went into production, FCA specified the engine fluids to be used and installed in them, including the type of coolant to be used. Thus, prior to the sale of each Class Vehicle, the fluids chosen and specified by FCA were installed. However, for Class Vehicles, a chemical reaction occurs when the factory installed system coolant chosen by FCA reacts with the Class Vehicles' aluminum engine and Cooling System components. This reaction is exacerbated if it occurs in the presence flux remaining from the fabrication process of any of the aluminum components. The result of the chemical reaction is the formation of a sludge that damages key components of the Cooling System, specifically causing the heater core, to fail.

21.    Plaintiffs and the Class do not learn of the existence of the Defect until their Class Vehicles' heating, cooling, and defrost functions quit working properly or completely fail. Upon information and belief, even newer models of Jeep Wranglers—including but not limited to the 2017 model year vehicles—are beginning to experience the manifestation of the Defect.

22.    The failure of the Cooling System in Class Vehicles compromises the safety of Class Vehicles. In the absence of a properly functioning Cooling System,

operators cannot sufficiently defrost their Class Vehicles windshields, rendering the vehicles difficult or impossible to drive in cold-weather conditions, such as when freezing precipitation occurs while the Class Vehicles are being driven. In addition, certain vulnerable drivers and passengers are unsafe when the vehicles' Cooling Systems do not operate properly. Vehicles without sufficient heating cannot safely be used to transport passengers in extremely cold temperatures, and without sufficient air conditioning cannot safely be used to transport people in extreme heat.

23.    The Defect cannot be cured by normal automotive maintenance because regular engine flushes do not completely remove the sludge from the heater core and other components of the Cooling System. Nor does regular service do anything to permanently eliminate the Defect. Fouled components must be replaced.

24.    As early as December 12, 2012, FCA issued a STAR Case Report to its dealerships and authorized service centers about the manifestation of the Defect in Class Vehicles, as shown below. This STAR Case report demonstrates that FCA knew of the Defect and its relation to "Poor Heater System Performance." FCA was able to identify the manifestation of the Defect ("Sludge may build up and restrict coolant flow in the heater core."), and FCA knew that its identification could be difficult ("The heater core may still be restricted even if sludge is not visible in the overflow bottle."). FCA identified specific steps to take to temporarily resolve the problem (repeatedly flushing the Cooling System until the water "runs clear."). Finally, the STAR Case Report identifies the parts that must be replaced when the lesser repair efforts prove to be ineffective (replacing the radiator, heater core, radiator cap, and engine oil cooler and coolant). Later STAR Case Reports, including one issued on December 5, 2014, are substantially similar but include an additional step for verification of heat after the repair.







**FCA ALSO KNEW OR SHOULD HAVE KNOWN
ABOUT THE DEFECT, IN PART,
BECAUSE CONSUMERS HAVE REPORTED
THE DEFECT TO FCA.**

25.    Beginning with the 2012 model year, thousands of Class Vehicles manufactured by FCA were equipped with the Pentastar engine. Since that time, there have been widespread complaints regarding the Defect posted on the Internet by absent Class Members, often noting that they also have contacted FCA directly:

#18  **Wrangler 3.6**
Automatic transmission    26,000 miles

I bought my 2012 Jeep Wrangler used in February 2015 with approximately 11,110 miles. By this winter (2016) I had put approximately 26,000 miles on the vehicle. When I went to turn on the heat the driver's side was blowing cold air and the passenger's side hot. I took it to my local garage and they said I had casting sand built up and suggested I replace my heater core and radiator. They encouraged me to contact Chrysler to see if they would do a "good faith" warranty replacement since this was a known problem. I called Chrysler and they said I needed to take my Jeep to a dealership for an official diagnostic test before they would make a decision. The dealership informed me that my heater core was already replaced in Jan. 2015 and likely needed to be replaced. The part was still under a Mopar warranty thankfully, but Mopar wanted the dealership to flush the heater core before they would authorize replacement of the part. Soooo, my heater core was flushed and now I have heat again. However, if this is a problem that results from casting sand build up (which the dealership mechanic said it was) won't this just happen again? In summary, at 11,000 miles the heater core was replaced. The new heater core needed to be replaced after 26,000 miles, but was flushed instead. I'm thinking of trading in the 2012 model for a newer one if this is a known problem with this year...

http://www.carcomplaints.com/Jeep/Wrangler/2012/AC_heater/heater_not_working.shtml (last visited on March 26, 2018).

#15  **Wrangler Sport 3.6L**
Automatic transmission    18,000 miles

2012 Wrangler Sport. No heat on the drivers side. After doing some research I learned that this is a common problem with the Wranglers and is likely caused because casting sand had not been sufficiently flushed from the engine block when manufactured. Coolant stirs up the casting sand and it then settles in the bottom of the radiator, heater core and overflow tank. The sediment in the heater core restricts coolant flow causing poor heating of the vehicle.

I checked my overflow tank and found about 3" of sand in the bottom. The service manager at the Jeep dealership said he did not have a recall, campaign or service bulletin on this and it would not be covered by Jeep. He said he'd not heard of the issue, but when he asked fellow service managers they had heard of it in older Wranglers. This is a pretty outrageous issue if you ask me. Nobody but Jeep dealers have serviced the vehicle, so where would significant amounts of sand-like residue come from to get into the cooling system?

Any feedback or help from the community would be appreciated.

http://www.carcomplaints.com/Jeep/Wrangler/2012/AC_heater/heater_not_working.shtml (last visited on March 26, 2018).



**#21** Wrangler Sahara 3.6L
Automatic transmission   46,500 miles

Bought this used 2012 Jeep Wrangler Unlimited Sahara in September, 2016 from a dealer in Cincinnati, Ohio. I test drove the vehicle on a 88 degree day so I couldn't tell if the heater was working properly or not. After getting it home to northern Michigan and turning on the heater on the first cool fall day, I immediately noticed just cool air coming from the heating system on the driver's side. After paying for a heater core flush and a thorough evaluation by the Jeep dealer it was determined that the heater core was plugged. I was informed at that time that there was no recall on the heater core and the repair was not covered by warranty. With winter on the way, I had no choice but to fix it at a cost of $1,163. It seems based on many other stories like this, Jeep obviously had a supplier problem and should step up to the plate and cover these repairs.

http://www.carcomplaints.com/Jeep/Wrangler/2012/AC_heater/heater_not_working.shtml (last visited on March 26, 2018).



http://www.wranglerforum.com/f202/heater-core-no-drivers-heat-and-casting-sand-388066.html (last visited on March 26, 2018).

**Heater Core, No Drivers Heat and Casting Sand**

I have a 2013 with 14,000 miles. The water pump was replaced in August at 9,600 miles due to the chirp.

I am currently getting blast furnace heat on the passenger side, Luke warm on the drivers side. I took it to the dealer today and they called, said it was fixed and blamed it on a sticky <u>actuator</u> in the duct work. When I arrived to pick it up, the problem was still there.

I explained the casting sand stories I have read on this forum and they said they would go ahead and replace the <u>heater</u> core tomorrow. They are expecting it to take two days because they have to pull the seats, console and dash. The A/C system also has to bled and then refilled.

http://www.wranglerforum.com/f202/heater-core-no-drivers-heat-and-casting-sand-388066.html (last visited on March 26, 2018).

26.     In addition, numerous complaints have been filed with the National Highway Traffic Safety Administration ("NHSTA"), which FCA, like other vehicle manufacturers, monitors regularly. These complaints discuss, among other details, how owners notified FCA of the Defect and the safety issues resulting from it.

27.     Selected examples of the NHTSA complaints about Class Vehicles are included below, unedited. These consumer complaints also put FCA on notice that the Defect renders the Class Vehicles unsafe to operate under certain normal and expected conditions, like extreme cold, heat, or when a properly functioning defrost system is required for visibility.

- <u>NHSTA Complaint on February 13, 2018 for a 2013 Wrangler</u>- "HEATER CORE CLOGGED RADIATOR SLUDGE LEFTOVER FROM CASTING SAND IN CYLINDER HEADS CIRCULATED THRU HEATING AND COOLING SYSTEMS CAUSE SAND TO SETTLE IN RADIATOR AND CLOG HEATER CORE."

- <u>NHSTA Complaint on January 31, 2018 for a 2014 Wrangler</u>- "CASTING SAND FROM THE HEADS HAS CONTAMINATED THE ENGINE COOLING SYSTEM LEADING TO MY RADIATOR AND HEATER CORE BECOMING CLOGGED WITH SEDIMENT."

- <u>NHSTA Complaint on January 08, 2018 for a 2016 Wrangler</u>- "CASTING SAND OR SOME OTHER FACTORY SLUDGE IN THE COOLING SYSTEM. KILLED MY HEATER CORE AND MAYBE MORE."

- <u>NHSTA Complaint on January 08, 2018 for a 2015 Wrangler</u>-"IT IS A KNOWN PROBLEM THAT THE JEEP WRANGLER HEATER CORE PREMATURELY CLOGS AND SUBSEQUENTLY FAILS CAUSING LESS HEAT FROM THE DRIVER'S SIDE DEFROSTER VENTS. DURING THIS RECENT COLD SNAP IN MICHIGAN THE DEFROSTER STRUGGLED TO ADEQUATELY CLEAR THE WINDSHIELD OF FROST AND SNOW AND I FELT THIS TO BE A SAFETY ISSUE. I APPROACHED MY JEEP DEALER AND THEY SAID "YEAH THE HEATER CORES GO OUT EARLY" NOTHING WE CAN DO, IT WILL BE $1500-2000 TO REPAIR AS IT INVOLVES REMOVING THE ENTIRE DASH. I HAVE NEVER HAD A HEATER CORE CLOG WITH LESS THAN 50,000 MILES, THIS IS CLEARLY A MANUFACTURERS DEFECT AND IN COLD WEATHER CLIMATES COLD POSE A SIGNIFICANT SAFETY HAZARD. . . ."

- <u>NHSTA Complaint on January 07, 2018 for a 2014 Wrangler</u>- "HEATER CORE PLUGGED UP WITH UNKNOWN SUBSTANCE OF FACTORY FILLED COOLANT, RESULTING IN POOR SNOW AND ICE REMOVAL OF WINDSHIELD DEFROSTER. 1356.00 REPAIR."

- <u>NHSTA Complaint on November 09, 2017 for a 2013 Wrangler</u>- "HEATER DOES NOT PRODUCE WARM AIR ON DRIVER SIDE OF VEHICLE THROUGH FLOOR, VENT, OR DEFROST. DRIVING SPEED DOES NOT AFFECT TEMPERATURE ON DRIVER SIDE. HEAT WILL SOMETIMES GET WARM ON DRIVER SIDE AFTER AN HOUR OF DRIVING. APPEARS TO BE RELATED TO STAR CASE S12307000008. THIS IS A WIDE SPREAD, KNOWN ISSUE, THAT IS VERY EXPENSIVE TO REPAIR. IT IS DANGEROUS AS WELL DUE TO ICE BUILD UP ON WINDSHIELD BECAUSE THERE IS NO DEFROST HEAT ON DRIVER SIDE"

- NHSTA Complaint on November 13, 2017 for a 2013 Wrangler-"JUST PURCHASED, HEAT NOT WORKING. HAD HEATER CORE FLUSHED, HEAT WORKED FOR ONE WEEK AND NOW BLOWS VERY HOT ON RIGHT SIDE AND LUKE WARM ON LEFT SIDE. THE SAME SYMPTOMS AS THE CASTING SAND PLUGGING THE HEATER CORE. I NOW HAVE TO TAKE BACK TO SHOP TO FLUSH HEATER CORE AGAIN. NOT GOOD."

- NHSTA Complaint on June 06, 2017 for a 2013 Wrangler-"THE VEHICLE HAS STOPPED BLOWING HOT AIR ON THE DRIVERS SIDE AND FEET, BUT WILL BLOW HOT AIR ON PASSENGERS SIDE. THIS LEADS TO ISSUES WITH DEFROSTING AND VISIBILITY."

- NHSTA Complaint on May 01, 2017 for a 2013 Wrangler-"THE VEHICLE HAS STOPPED BLOWING HOT AIR ON THE DRIVERS SIDE AND FEET BUT WILL BLOW HOT AIR ON PASSENGERS SIDE. THIS LEADS TO ISSUES WITH DEFROSTING AND VISIBILITY AS WELL AS THE DRIVER BEING SAFE AND ABLE TO FEEL THEIR FINGERS AND FEET WHILE DRIVING. I TOOK IT TO THE DEALER WHO SAYS THERE IS A STAR REPORT ON THIS ISSUE AND IT IS A WELL KNOWN ISSUE. JEEP HOWEVER SAYS I AM OUT OF WARRANTY SO THEY WILL NOT FIX IT. MY EXTENDED WARRANTY BOUGHT THROUGH THE DEALERSHIP SAYS THEY WILL NOT FIX IT. THE RADIATOR, HEATER CORE OVER FLOW TANK AND ALL OTHER RELATED COMPONENTS ARE THE RECOMMENDED REPAIR."

- NHSTA Complaint on January 03, 2017 for a 2013 Wrangler "TL* THE CONTACT OWNS A 2013 JEEP WRANGLER. UPON CHECKING THE VEHICLE'S COOLANT, THE CONTACT NOTICED ABNORMAL COLORED COOLANT. THE VEHICLE WAS TAKEN TO THE DEALER TO GET A COOLANT FLUSH WHERE IT WAS DIAGNOSED THAT THERE WAS CASTING SAND IN THE COOLANT. THE VEHICLE WAS REPAIRED; HOWEVER, UPON RETURNING THE VEHICLE HOME, THE CONTACT INSPECTED THE COOLANT SYSTEM AND NOTICED THAT IT HAD BEEN CONTAMINATED BY SAND PARTICLES. THE MANUFACTURER WAS NOTIFIED OF

THE FAILURE. THE FAILURE MILEAGE WAS 28,000....UPDATED 03/08/17 *BF"

- NHSTA Complaint on January 02, 2017 for a 2012 Wrangler "FROM: CUSTOMER VEHICLE: 2012 JEEP WRANGLER SPORT, PURCHASED NEW IN 2012. REFERENCE: PROBLEMS IN HEATING SYSTEM TO WHOM IT MAY CONCERN, I PURCHASED A NEW 2012 JEEP WRANGLER SPORT FROM HENDRICK CHRYSLER JEEP IN FAYETTEVILLE, NC. FOURTEEN MONTHS LATER, I MOVED TO FLORIDA, WHERE THERE WAS NO NEED TO USE THE HEATER. UPON MY RETURN TO NORTH CAROLINA IN THE WINTER OF 2014, I NOTICED THAT HEATER ON THE DRIVER'S SIDE WAS NOT AS WARM AS THE PASSENGER'S SIDE. THE FOLLOWING WINTER, THE HEAT ON THE DRIVER'S SIDE FADED TO A POINT WHERE IT WAS BARELY WORKING. AFTER RESEARCHING THE ISSUE AND SPEAKING WITH A REPRESENTATIVE AT HENDRICK JEEP SERVICE CENTER, I LEARNED THAT THE HEATER CORE WAS LIKELY THE PROBLEM AND THAT I WOULD NEED TO FLUSH THE HEATER CORE. IN JANUARY 2015, I TOOK MY JEEP TO A PRIVATE MECHANIC TO HAVE THE HEATER CORE FLUSHED, WHICH FIXED THE PROBLEM FOR A SHORT TIME. RESEARCH ONLINE AMONG JEEP OWNERS OF MY MODEL AND YEAR REVEALED THAT THE LONG-TERM SOLUTION IS A NEW RADIATOR AND HEATER CORE (NEITHER OF WHICH ARE UNDER WARRANTY OR UNDER RECALL). THE POOR CLEANING AT THE TIME OF MANUFACTURING HAS CAUSED THE CASTING OF SAND IN THE HEATER CORE AND RADIATOR, RESULTING BUILD UP THAT BLOCKS HEAT. NOW, IN WINTER OF 2016, MY HEATER DOES NOT WORK. I CANNOT FIND A RECALL OR A REBATE FOR THE MORE THAN $2,400 DEALER ESTIMATE I RECEIVED TO REPLACE MY HEATER CORE AND RADIATOR. I FOUND A CHRYSLER STAR CASE (SEE ATTACHMENT) THAT GIVES STEPS TO FIX THE PROBLEM WITHOUT ACKNOWLEDGING ITS ORIGINS IN MANUFACTURING. I HAVE EMAILED CHRYSLER WITH A REQUEST FOR SUPPORT, TO NO AVAIL. GIVEN THAT THIS PROBLEM IS SO WIDESPREAD AND CONSISTANT AMONG JEEP OWNERS OF MY MODEL AND YEAR, I WANTED TO

SHARE THE CASE WITH THE RECALL AGENCY, ALTHOUGH I KNOW THIS IS NOT A DIRECT "SAFETY ISSUE.""

- <u>NHSTA Complaint on December 12, 2016 for a 2011 Wrangler</u>- "THE HEATER IN MY JEEP HAS NEVER WORKED SINCE WE BOUGHT IT! THE DRIVER SIDE ESPECIALLY! WE TOOK IT BACK WHERE WE BOUGHT IT AND THEY SAID THE VENT WAS STUCK AND IT JUST CONTINUES TO GET WORSE NOW ITS FREEZING. ONLINE THE INTERNET IS BLOWING UP W/ PEOPLE W/ THE SAME ISSUES WITH THESE. VEHICLES. WHY IS THERE NOT A RECALL? THIS SHOULD BE A CLASS ACTION LAWSUITE IF YOU DO NOT TAKE CARE OF THIS ASAP!"

- <u>NHSTA Complaint on August 16, 2017 for a 2013 Wrangler</u> HAVING PROBLEMS WITH MY HEATER CORE AND RADIATOR BECOMING CLOGGED I HAVE HAD THEM BOTH FLUSHED BY THE DEALERSHIP SEVERAL TIMES AND THEY STILL CLOG CAUSING HAZARDOUS DRIVING IN THE WINTER TIME WITH NO DEFROSTERS OR HEAT TO SAFELY DRIVE TO WORK

- <u>NHSTA Complaint on August 16, 2017 for a 2013 Wrangler</u>- "TL* THE CONTACT OWNS A 2012 JEEP WRANGLER. THE CONTACT STATED THAT THE COOLING SYSTEM STOPPED WORKING AND THE CHECK ENGINE LIGHT ILLUMINATED. THE VEHICLE WAS TAKEN TO A LOCAL DEALER WHERE IT WAS DIAGNOSED THAT THERE WAS CASTING SAND IN THE COOLING SYSTEM, WHICH CLOGGED UP THE RADIATOR, THE WATER PUMP, OIL COOLER, HEATER CORE, AND THE COOLING PART OF THE ENGINE. THE DEALER STATED THAT ALL THE CLOGGED PARTS NEEDED TO BE REPLACED. THE MANUFACTURER WAS MADE AWARE OF THE ISSUE AND STATED THAT THE PARTS WERE NOT COVERED BY THE WARRANTY AND THAT THERE WAS NO RECALL. THE VEHICLE WAS NOT REPAIRED. THE FAILURE MILEAGE WAS 62,000."

- <u>NHSTA Complaint on March 03, 2016 for a 2012 Wrangler</u> -"I TOOK MY 2012 JEEP INTO A DEALER SPIRIT DODGE IN SWEDESBORO NJ 08085 SATURDAY 2/27/16 MY

COMPLAINT WAS NO HEAT. I WAS TOLD IT NEEDS A HEATER CORE A RADIATOR, AND TRANS COOLER. AND THAT MY EASY CARE EXTENDED WARRANTY DID NOT COVER IT EVEN THOUGH IT SAYS IT COVERS HEAT. MY EASY CARE CONTRACT NUMBER IS EGTK886782. MY JEEP HAS 52000 MILES. THEY SAID IT HAS SLUDGE IN THE SYSTEM. NOW MY SYSTEM IS NOT SCHUELDED TO BE CLEANED FLUSHED TILL 60 MONTH. SO IT FAILED BEFORE THE TIME. I WAS TOLD IT'S A KNOW PROBLEM BUT THEY HAVE NOT RECALLED THEM. I BOUGHT THE JEEP AT VANN DODGE IN VINELAND NJ. SO I REALLY FEEL CHEATED. I HAVE HAD NO HEAT FOR A WHILE BUT I DIDN'T REPORT RIGHT AWAY"

- <u>NHSTA Complaint on May 05, 2015 for a 2012 Wrangler</u> –"I HAVE A 2012 JEEP WRANGLER UNLIMITED WITH 40K MILES. AROUND 15K MILES, I STARTED EXPERIENCING ISSUES WITH THE DRIVER SIDE AND FRONT WINDSHIELD HEATING/DEFROSTING NOT WORKING. HEATING WORKS ON THE PASSENGER SIDE, BUT NOT ON THE DRIVER"S SIDE SEATING OR WINDSHIELD AREAS. THIS ISSUE CREATES A COMFORT PROBLEM DURING COLD DAYS DUE TO NO HEAT ON THE DRIVER'S SIDE BUT MORE IMPORTANTLY, CREATES A SAFETY ISSUE BECAUSE THE FRONT WINDSHIELD DOES NOT DEFROST PROPERLY WITHOUT SUFFICIENT HEAT, CREATING UNSAFE DRIVING SCENARIOS. THIS ISSUE WAS INTERMITTENT AT FIRST, BUT OVER THE PAST 20K MILES HAS BECOME A FREQUENT COMFORT AND SAFETY ISSUE. THIS DEFECT/ISSUE/DESIGN FLAW IS A KNOWN PROBLEM WITH THE CURRENT WRANGLER UNLIMITED AS A NUMBER OF OTHERS I KNOW WITH THE SAME VEHICLE EXPERIENCE THIS ISSUE AND YOU CAN FIND ENDLESS COMPLAINTS OF THE ISSUE ON LINE. MY DEALER ALSO EXPLAINED THEY RECEIVE FREQUENT COMPLAINTS FOR THIS PROBLEM. I BROUGHT MY JEEP TO THE DEALERSHIP. THEY EXPLAINED I NEED THE HEATING CORE REPLACED, AND DUE TO ITS LOCATION BEHIND THE DASHBOARD WILL COST ME $1000+ TO REPAIR, PRIMARILY DUE TO THE LABOR REQUIRED TO PULL OFF THE DASHBOARD AND OTHER CAR PARTS TO REACH AND REPLACE THE HEATING CORE. THIS ISSUE

SHOULD BE A RECOGNIZED SAFETY RECALL OR SERVICE BULLETIN BY JEEP/CHRYSLER WITH NO OUT OF POCKET REPAIR EXPENSE FOR THE VEHICLE OWNERS WHO EXPECT TO RECEIVE SAFE, HIGH QUALITY, WELL DESIGNED PRODUCTS FROM JEEP/CHRYSLER."

- NHSTA Complaint on February 02, 2015 for a 2012 Wrangler- "VEHICLE HAS NO HEAT ON DRIVER SIDE VENT AND FLOOR VENTS, COLD AIR COMES OUT AS IF THE A/C IS ON. AS TIME HAS PASSED COOL AIR ON FRONT WINDOW DEFROSTER AS WELL AS CENTER AND PASSENGER VENTS. VEHICLE IS WARMED UP WHEN TRYING TO TURN HEAT ON WITH NO POSITIVE RESULTS. ONLINE JEEP FORUMS LIST THIS AS A PROBLEM TO JEEP WRANGLERS. DEALERSHIP STATED THEY ARE UNAWARE OF THIS PROBLEM. THIS IS A SAFETY ISSUE TO DEFROST WINDOWS FOR VISIBILITY, AND SHOULD BE A RECALL. VEHICLE IS ALMOST 3 YEARS OLD. *TR"

- NHSTA Complaint on October 21, 2015 for a 2012 Wrangler- "MY CAR WAS MANUFACTURED WRONG... MY ENGINE BLOCK IS CASTING SAND INTO MY COOLANT SYSTEM WHICH THEN BLOWS OUT MY HEATER CORE AND RADIATOR. I HAVE SPENT 5 MONTHS UNDER WARRENTY TRYING TO FIX WITH ISSUE BUT THE JEEP DEALER AND CHRYSLER GIVE ME THE RUN AROUND. I WAS TRYING TO GET THIS FIX UNDER WARRENTY BUT ALL THE RUN AROUND I GOT FROM THE DEALERS HAS CAUSED MY WARRANTY TO EXPIRE WITH NO FIX. I THINK I HAVE BOUGHT A LAMON OF A CAR I ONLY HAVE 14K MILES , MY ISSUE STARTED AT 7K MILES. NOW IT IS WINTER TIME AND IN DRIVING MY CAR WITH NO HEAT. I HAVE A NEW BORN BABY ON THE WAY WHO WILL GET SICK INSIDE MY CAR. JEEP DOES NOT WANT TO COVER THE COST OF MY REPAIRS TO REPLACE THE HEATER CORE AND RADIATOR ALSO A COMPLETE FLUSH OF THIS SAND COMING FROM THE ENGINE. THIS IS A HAZARD FOR ME AND MY BABY TO DRIVE AROUND IN THIS COLD VEHICLE . THIS IS A KNOWN PROBLEM BUT JEEP\CHRYSLER IS TRYING THEIR BEST TO KEEP THIS QUIET. ILL BE TRYING TO

CONTACT A LAWYER SOON OR MAYBE A NEWS STATION."

- NHSTA Complaint on April 10, 2015 for a 2012 Wrangler-"AT THE BEGINNING OF WINTER I NOTICE THE DEFROST/HEAT IN THE JEEP WAS NOT PUTTING OUT A LOT OF HEAT. IT WOULD BARELY DEFROST THE WINDSHIELD. WITH THE FRIGID WEATHER WE HAVE HAD, I JUST HAD IT CHECKED. I WAS TOLD THE HEATER CORE, AND THE RADIATOR WOULD NEED CHANGED BECAUSE THEY WERE PLUGGED. I FEEL SORRY FOR ANYONE THAT OWNS A CHRYSLER PRODUCT. THIS STILL DOES NOT RUN RIGHT AFTER THE HEAD WAS CHANGED, NO DUMMY LIGHT COMES ON, SO NONE OF THE MECHANICS WILL BELIEVE ME THAT IT IS NOT RIGHT. AS YOU CAN SEE BY THE MILEAGE IT IS OUT OF WARRANTY, THE ISSUES STARTED RIGHT AFTER I BOUGHT IT. IT IS NOT THE DEALERSHIPS FAULT, IT IS THE COMPANY. DO SOMETHING TO GET THE ISSUES FIXED! *TR."

- NHSTA Complaint on December 03, 2014 for a 2012 Wrangler- "VEHICLE STOPPED GETTING HEAT FROM ALL VENTS ON DRIVERS SIDE, INCLUDING DEFROSTER AND ONLY LUKE WARM HEAT ON THE PASSENGER SIDE. ALL REGULAR MAINTENANCE HAD BEEN PERFORMED ON THE VEHICLE. DEALER SAYS RADIATOR AND HEATER CORE NEED TO BE REPLACED AS THEY ARE FILLED WITH 'SLUDGE'. A LITTLE RESEARCH ONLINE AND THIS SEEMS TO BE AN ALL TO COMMON ISSUE WITH THESE JEEPS AND CHRYSLER HAS GIVEN NO ANSWER AS TO THE CAUSE. WHILE NOT HAVING HEAT IS INCONVENIENT, NOT BEING ABLE TO DEFROST THE WINDSHIELD IS A SAFETY HAZARD. THEY ARE CURRENTLY FIGHTING ME ON PAYING FOR THIS AS THE VEHICLE IS JUST OUT OF WARRANTY. THIS IS AN ISSUE CHRYSLER IS FULLY AWARE OF AND HAS DONE NOTHING TO FIX! FURTHER INVESTIGATING HAS SHOWN THAT IGNORING THIS PROBLEM AND NOT REMOVING THIS SLUDGE COULD EVENTUALLY LEAD TO ENGINE FAILURE. *JS"

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- <u>NHSTA Complaint on January 24, 2014 for a 2012 Wrangler</u>- "DRIVING & NOTICE THAT WINDOW STARTED TO FROST UP, AT THE SAME TIME NOTICE THAT THE HEAT WAS NOT GETTING WARM AFTER DRIVING FOR OVER 20 MINS. TURNED THE DEFROST ON AND IT STARTED TO FROST MORE, PUT MY HAND TO THE BLOWERS & NOTICE THAT IT WAS BLOWING COOL AIR. DOUBLE CHECKED THAT I HAD THE HEAT ON AND PUT IT TO HIGH AND IT CONTINUED TO BLOW COOL AIR, REACHED OVER TO THE PASSENGER SIDE AND IT WAS BLOWING WARM AIR. MADE AN APPOINTMENT TOOK MY VEHICLE IN AS IT ALREADY HAD A RECALL ON IT FOR SOMETHING ELSE EXPLAIN TO THEM WHAT WAS GOING ON WITH THE HEATER, THEY SAID THAT THE PART FOR MY HEATER WOULD TAKE 2 DAYS TO GET IN & THEY WOULD CALL. ONE WEEK LATER HAD NOT HEARD ANYTHING, WENT BACK TO THE JEEP DEALERSHIP(COLORADO CHRYSLER JEEP) SERVICE & ASKED ABOUT THE PART, WAS TOLD THAT IT WAS NOTHING PUT IN OR SHOWN ABOUT MY COMPLAINT ABOUT MY HEATER.SET R ANOTHER APPOINTMENT TO BRING MY JEEP IN TO HAVE THE HEATER REPAIRED & WAS TOLD IT WOULD TAKE 4 HOURS, AFTER BEING THERE FOR OVER AN HOUR THEY SAID IT WAS GOING TO BE A 2 DAY REPAIR...IT WAS A RECALL BUT NOT A RECALL & THAT THEY WOULD BE REPLACING THE RADIATOR AND HEATER CORE. APPOINTMENT FOR 1/3/14 AND WAS TOLD IT WOULD BE READY ON 1/6/ OR 1/7/14. MY JEEP WAS NOT READY UNTIL 1/22/14 AND WHEN I PICKED IT UP ON 1/23/14 THEY TOLD ME THEY THE FLUSHED HEATER CORE, RADIATOR AND OVERFLOW TANK...FLUSHED ENTIRE SYSTEM FILLED AND BLEED SYSTEM WITH NEW COOLANT AND CHECKED TEMP AT 155 DEGREES. THAT SHOULD FIX IT AND IF IT DID NOT THEN THEY WOULD REPLACE THE RADIATOR AND HEATER CORE. THEN GOT IN THE JEEP LET IT RUN FOR OVER 8 MINS HEATER ON LEFT SIDE WAS STILLING BLOWING COOL AND RIGHT WAS BLOWING WARM. TOOK OVER 18 MINS FOR THE LEFT SIDE TO BLOW WARM BUT WAS NOT AS WARM AS RIGHT SIDE. TAKING JEEP TO DIFFERENT JEEP DEALERSHIP SERVICE DEPARTMENT TOMORROW

AS THE SERVICE SIMPLY SHOW THAT THEY DID NOT DO THE JOB THEY SHOULD HAVE. *TR"

## FCA'S EXPRESS WARRANTIES COVER THE DEFECT

28.    FCA's written warranties for Class Vehicles cover the Defect, including (among others), a "New Vehicle Limited Warranty" that provides "bumper to bumper coverage for 3 years or 36,000 miles"; and a "Powertrain Limited Warranty" that provides coverage for "5 years or 100,000 miles." These and other warranties, promise that FCA will repair or replace engine and other components arising from defects in materials or workmanship at no cost to Class Members. Since the Defect consists of a chemical reaction between coolant utilized by FCA and aluminum engine/Cooling System components within the Class Vehicles, the New Vehicle and/or Powertrain Limited Warranties cover the Defect.

29.    FCA's warranties appear in window labels on the vehicles, in the owner's manuals and brochures, and on the company's websites.

## PLAINTIFFS' EXPERIENCES

**Jason Blissard**

30.    On or about June of 2012, Jason Blissard, as a retiring U.S. military serviceman who was in the midst of moving to California, purchased a new 2012 Jeep Wrangler, VIN 1C4AJWAGXCL206459, for personal and family use from Army & Air Force Exchange Services ("AAFES") Auto Sales in Okinawa, Japan where he was stationed at the time he placed the vehicle order. Immediately upon his purchase and receipt of the vehicle, it was registered and insured in the State of California. Like all FCA vehicles, Mr. Blissard's Class Vehicle came with FCA's Limited Warranty and Powertrain Limited Warranty.

31.    Prior to purchasing his vehicle, Mr. Blissard reviewed advertising and brochures about the FCA Jeep Wrangler he was considering. Nothing in these FCA documents, advertising, or brochures mentioned the Defect. In addition, he did ordinary research to learn more about the vehicle he was considering purchasing and discovered nothing about the Defect prior to purchasing the vehicle.

32.    After purchasing his Class Vehicle, Mr. Blissard performed normal and routine maintenance, most often completed at Crown Dodge Chrysler Jeep Ram in Ventura County, California ("Crown"). At no point was Mr. Blissard ever informed by FCA or its authorized service departments that his Class Vehicle contained the Defect. Despite receiving notices for other recalls (airbags and transmission oil cooler tube) from FCA, he received no notices about the Defect as described herein.

33.    In October 2017, with approximately 61,000 miles on the vehicle, Mr. Blissard attempted to use the heat in his Class Vehicle, only to have it emit cold air despite the heat being set to the warmest setting. This condition continued to occur during the entire operation of the vehicle on that occasion and others going forward.

34.    In late October 2017, with 61,182 miles on his vehicle and within the Class Vehicle's Powertrain Warranty, Mr. Blissard took his vehicle to Crown to have the heater fixed. After confirming that his heater was blowing cold air, the dealership reset the HVAC Module Software in an attempt to alleviate the problem. He was charged $193.49 for this "repair" but it did not fix the problem with his heating and cooling system.

35.    In late November 2017, with approximately 62,071 miles on the vehicle, Mr. Blissard took his vehicle back to Crown due to the persistence of his vehicle's heating problems. After performing an inspection, the dealership flushed the cooling system, which provided a temporary fix.

36.    In mid-December 2017, Mr. Blissard took his vehicle back to Crown because the vehicle had been leaking coolant since the November repair. At that time, his radiator was replaced. He was charged and paid $632.81 for the repair.

37.    In late December 2017, Mr. Blissard returned to Crown. He complained that the heating system becomes cooler after driving a while and blows hotter on the passenger side than the driver's side of the vehicle. No repair was completed at the time of this inspection, nor was he informed that these symptoms are the result of a Defect known to FCA.

38.    Mr. Blissard's vehicle now has just over 66,000 miles on it, and still continues to have Cooling System problems. Mr. Blissard did not receive the benefit of his bargain. Had he been advised of the Defect at the point of sale, he either would not have purchased the vehicle or would have paid less for it than he did.

**Shane Redman**

39.    On or about April of 2017, Plaintiff Shane Redman purchased a used 2012 Jeep Wrangler Unlimited, VIN Number 1C4HJWDG1CL185978, for personal and family use from CarMax located in Oxnard, California. Like all FCA vehicles, Mr. Redman's Class Vehicle was originally sold with FCA's Limited Warranty and Powertrain Limited Warranty. He purchased an extended warranty from CarMax that covered his vehicle for an additional 4 years or up to 125,000 miles, whichever came first. At the time of his purchase, the Jeep had approximately 55,000 miles on it.

40.    Prior to purchasing his vehicle, Mr. Redman reviewed advertising and brochures written and produced by FCA about the FCA Jeep Wrangler he was considering. Nothing was included in these FCA documents about the Defect. In addition, he did ordinary research to learn more about the Jeep he was considering purchasing, but never found a disclosure about the Defect.

41.    In November 2017, Mr. Redman went on a camping trip and had frost and ice on his windshield. When he attempted to clear the windshield with the heat and defrost, he had no heat at all. The following day, he took his vehicle to A-1 Transmission Service of Brentwood, California. Upon inspection at A-1 Transmission, the mechanics performed a flush of his radiator and removed close to two cups of sandy sludge. Even with the removal of this sludge, the Cooling System did not perform. A-1 Transmission recommended the replacement of the heater core and radiator.

42.    After first being refused, the extended warranty company eventually covered the replacement of his vehicle's heater core and radiator in late January 2018.

43.    Mr. Redman contacted FCA and was told to contact the regional manager of FCA for Southern California. Although he left messages requesting a returned call from the regional manager, he never called back nor ever able to reach him about this Defect.

44.    Mr. Redman's Jeep now has approximately 74,000 miles on it. Mr. Redman did not receive the benefit of his bargain in that had he been advised of the Defect at the point of sale, he either would not have purchased the vehicle or would have paid less for it than he did.

## CLASS ALLEGATIONS

45.    At the time of Plaintiffs' and the Class Members' purchases, FCA failed to disclose the consumer complaints, malfunctions, safety hazards, and material facts related to the Class Vehicles' Defect and how it would cause harm to other vehicle components or that it could create a safety issue during inclement weather.

46.    Before Plaintiffs purchased their Class Vehicles, Plaintiffs were neither informed about, nor were aware of, the Defect and how it affected Class Vehicles'

engine components. The Defect was present in the Class Vehicles at the time they were placed into the stream of commerce.

47. FCA was in a superior position to know the facts surrounding the Defect in the Class Vehicles and that it is latent and not easily discoverable. However, instead of disclosing the material Defect to consumers and potential purchasers of the Class Vehicles, FCA omitted information about it with the intent of selling its vehicles to unsuspecting consumers. FCA was under a continuing duty to consumers to disclose the facts that it knew about the Defect's potential safety hazards, regardless the presence of any applicable warranty. Plaintiffs and the Class Members relied upon FCA's representations about the safety and functionality of the Class Vehicles when making their purchasing decisions.

48. FCA intentionally concealed the Defect—a material omission—from potential purchasers. Concealment or omission of a material fact in a transaction constitutes fraud, especially when the fact is known to the manufacturer and is not readily ascertainable to consumers despite ordinary diligence and reasonable investigation prior to purchases.

49. FCA neither discloses the Defect at the point of sale nor later when the Class Vehicles are brought to dealerships or service centers when the problems resulting from the Defect (sludge build-up) become evident. As a result, unwitting consumers are forced to repeatedly pay for ineffective "repairs" including, but not limited to, flushing sludge from the cooling system.

50. Had FCA disclosed the Defect, Plaintiffs would not have purchased the Class Vehicles or would have paid significantly less for them. Plaintiffs were denied information about the Defect that was material to their purchasing decisions and willingness to use their Class Vehicles.

51.     Plaintiffs and Class Members experienced damages from the Defect within the warranty period on their vehicles. Plaintiffs and Class Members reasonably expected that any and all damage resulting from the Defect would be covered under FCA's warranties and that they would not be charged for such repairs.

52.     FCA systematically denies warranty coverage with respect to the Defect. As a result of FCA's inaction and silence, consumers are unaware that they purchased or leased Class Vehicles that had the Defect at the point of sale, and continue to drive them in their defective and unsafe condition. In addition, consumers who experience a manifestation of the Defect and submit their vehicles for repairs are not told that the "repairs" they pay for are ineffective and will have to be repeated.

53.     Due to the Defect, the values of the Class Vehicles at the time of purchase or lease were less than the amounts Plaintiffs and Class Members paid.

54.     The Defect causes the Class Vehicles to lose value, including reducing trade-in and re-sale value.

55.     The Defect causes Class Members to incur repair costs, lose use and enjoyment of their Class Vehicles, and to suffer a loss of time and suffering the burden of arranging and obtaining repairs.

## PROPOSED CLASS

56.     Plaintiffs bring this case as a class action under Fed. R. Civ. P. 23(b)(2) and/or 23(b)(3) on behalf of the following Class:

> *All persons who purchased or leased a 2012-2017 FCA Jeep Wrangler for personal or family use in the State of California*

## CLASS CERTIFICATION ALLEGATIONS

57.    <u>Numerosity</u>. The Class is comprised of hundreds of Class Vehicle owners within California, making joinder difficult if not impossible.

58.    <u>Commonality</u>. Questions of law and fact exist that are common to all Class Members, and predominate over any questions that affect only individual Class Members, including (among others):

a.    Whether Class Vehicles suffer from the Defect;

b.    Whether the Defect causes damage to the heater core and other components of the Class Vehicles' Cooling System;

c.    Whether the Defect existed at the time the Class Vehicles entered the stream of commerce;

d.    Whether FCA knew or should have known about the Defect;

e.    Whether FCA failed to disclose Defect at the time that Class Members purchased the Class Vehicles or thereafter;

f.    Whether FCA breached its express warranties by failing to permanently repair or refusing to repair the Defect for Class Members;

g.    Whether FCA's failure to disclose the Defect constitutes an unfair and deceptive act or practice in violation of the California Merchandising Practices Act;

h.    Whether FCA acted or refused to act on grounds generally applicable to the Class, thereby making the award of equitable relief appropriate to the Class as a whole;

i. Whether FCA's conduct violates federal law pursuant to Magnuson-Moss Warranty Act;

j. Whether FCA's conduct violates state law pursuant to the Song-Beverly Act;

k. Whether the Defect diminishes the value of the Class Vehicles.

59. <u>Typicality</u>. Plaintiffs' claims are typical of the claims of Class Members.

60. <u>Adequacy</u>. Plaintiffs are adequate representatives of the proposed classes because their interests do not conflict with the interests of the members of the classes they seek to represent. Plaintiffs retained counsel who are competent and experienced in complex class action litigation, and will prosecute vigorously on Class Members' behalf.

61. <u>Superiority</u>. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each Class Member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against FCA economically feasible. Even if Class Members themselves could afford individualized litigation, the court system could not. In addition to the burden and expense of managing many actions arising from the Defect, individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

62. In the alternative, the proposed Class(es) may be certified because:

a.      the prosecution of separate actions by the individual members of the proposed classes would create a risk of inconsistent adjudications, which could establish incompatible standards of conduct for FCA;

b.      the prosecution of individual actions could result in adjudications that, as a practical matter, would be dispositive of the interests of non-party Class Members, or which would substantially impair their ability to protect their interests; and

c.      FCA acted or refused to act on grounds generally applicable to the proposed classes, thereby making appropriate final and injunctive relief with respect to members of the proposed classes as a whole.

63.      <u>Predominance</u>. This class action is appropriate for certification because questions of law and fact common to Class Members predominate over questions affecting only individual members.

## **TOLLING OF STATUTE OF LIMITATIONS**

64.      <u>Active Concealment Tolling</u>. Any statutes of limitations are tolled by FCA's knowing and active omission and concealment that the Class Vehicles suffered from a Defect. FCA had a duty to disclose this Defect and its consequent performance and safety problems to Plaintiffs and Class Members because FCA had superior knowledge of this defect and the defect was neither known to, nor easily discoverable by, Plaintiffs and Class Members.

65.      Despite its affirmative duty to disclose the nature and existence of this Defect, FCA kept Plaintiffs and Class Members ignorant of vital information essential to the pursuit of their claim. FCA kept Plaintiffs and Class Members ignorant of vital

information essential to the pursuit of their claims, without any fault or lack of diligence on the part of Plaintiffs or Class Members. The details of FCA's efforts to omit its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and the Class Members. Plaintiffs could not reasonably have discovered the fact that the Class Vehicles suffered from a Defect.

66.    Estoppel. FCA was and is under a continuing duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the Defect. At all relevant times, and continuing to this day, FCA knowingly, affirmatively, and actively misrepresented and omitted the true character, quality, and nature of the problems caused by this Defect. The details of FCA's knowledge and omissions are in its possession, custody, and control, to the exclusion of Plaintiffs and Class Members. Plaintiffs and Class Members reasonably relied upon FCA's knowing and/or omissions. Based on the foregoing, FCA is estoped from relying upon any statutes of limitation in defense of this action.

67.    Equitable Tolling. FCA took active steps to omit the fact that it wrongfully, improperly, illegally, and repeatedly manufactured, marketed, distributed, sold, and/or leased the Class Vehicles with the heating and cooling system problems caused by the Defect. The details of FCA's efforts to conceal the Defect are in its possession, custody, and control, to the exclusion of Plaintiffs and Class Members. FCA's failure to disclose and active concealment of the Defect amounts to bad faith and deception in and of itself. When Plaintiffs learned about this material information, they exercised due diligence by thoroughly investigating the situation, retaining counsel, and pursuing their claims. Should it be necessary, therefore, all applicable statutes of limitation are tolled under the doctrine of equitable tolling.

68.     Given FCA's active and knowing concealment of the Defect, equitable tolling of the statutes of limitations applicable to the causes of action brought in this case is appropriate.

69.     Plaintiffs and Class Members could not have reasonable discovered the true reasons for the Defect until the recent investigation which led to the filing of this Complaint.

## FIRST CAUSE OF ACTION
### Breach of Express Warranties

70.     Plaintiffs, individually and on behalf of the Class, incorporate all of the foregoing allegations into this cause of action.

71.     FCA expressly warrantied that it would cover the cost of all parts and labor needed to repair any item that was defective in material, workmanship or factory preparation when a Class Vehicle left the manufacturing plant.

72.     FCA materially breached its express warranties by manufacturing, selling, and leasing Class Vehicles that contained the Defect, which rendered them unsafe or unfit for use as warranted.

73.     FCA was put on notice of the breach by Plaintiffs' efforts to get their Class Vehicles repaired at its authorized dealerships.

74.     FCA's express warranties failed in their essential purpose because, despite multiple attempts to repair the Defect, it repeatedly manifests in the Class Vehicles owned or leased by Plaintiffs and Class Members after the "repairs" are made. In other words, flushing the sludge-like residue from Class Vehicles only temporarily reduces the manifestation of the Defect, but does not remediate the Defect on a permanent basis.

75.     As a result of FCA's breach of warranties, Plaintiffs and Class Members have sustained damages, including diminished value of their Class Vehicles.

76.     FCA's time limits on its warranties are unconscionable because FCA knew or had reason to know that Plaintiffs and Class Members might not experience or detect sludge-like build-up in the early life of their Class Vehicles and, in many instances, detection of the Defect would only occur once the Cooling System stopped working properly after the warranty period had expired. By making misleading representations and/omissions about the Defect, FCA prevented Class Members from timely exercising their rights under the warranties.

77.     Plaintiffs and Class Members are entitled to recover all damages as a result of FCA's breach of warranties in an amount in excess of $5,000,000.00.

## SECOND CAUSE OF ACTION
### Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*

78.     Plaintiffs, individually and on behalf of the Class, incorporate all of the foregoing allegations into this cause of action.

79.     Under the Magnuson-Moss Warranty Act, Class Members are "consumers," FCA is a "supplier" and "warrantor," and the Class Vehicles (and their defective Cooling Systems) are "consumer products."

80.     Under 15 U.S.C. § 2301(d)(1), the Magnuson-Moss Warranty Act provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

81.     FCA's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

82.     FCA breached these warranties as described in more detail above in the First Cause of Action. Without limitation, all Class Vehicles suffer from a common Defect that manifests in the Cooling System and is present at the point of sale.

83.     Under the Magnuson-Moss Warranty Act, FCA was obligated to disclose to Class Members the known Defect within the Jeeps, and was obligated to repair or otherwise remedy the Defect.

84.     To the extent necessary, Plaintiffs and each Class Member have had sufficient direct dealings with FCA or its agents (including dealerships) to establish privity of contract between FCA, on the one hand, and Plaintiffs and each Class Member, on the other hand. Nonetheless, privity is not required here because Plaintiffs and each member of the Class are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's express and/or implied warranties. These dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers only.

85.     FCA failed to meet its disclosure and remedy obligations, despite reasonable opportunity to do so.

86.     FCA's violation of the Act caused damage to Class Members and entitles them to statutory relief.

### THIRD CAUSE OF ACTION
### Breach of Implied Warranties

87.     Plaintiffs, individually and on behalf of the Class, incorporate all of the foregoing allegations into this cause of action.

88.    FCA warrantied that Class Vehicles were of merchantable quality and fit for their ordinary purpose. FCA warrantied that the Class Vehicles' primary components, including the Cooling System, would operate properly. FCA breached these implied warranties in that the Class Vehicles were not merchantable because they cannot be driven safely under all reasonably expected weather conditions and thus are not reliable for safe transportation. The Class Vehicles' Cooling Systems contained the Defect described herein, such that their heating, cooling, and defrosting mechanisms repeatedly failed to function properly, sometimes beginning early on in the vehicles' expected useful life.

89.    To the extent necessary, Plaintiffs and each Class Member have had sufficient direct dealings with FCA or its agents (including dealerships) to establish privity of contract between FCA, on the one hand, and Plaintiffs and each member of the Class, on the other hand. Nonetheless, privity is not required here because Plaintiffs and each Class Member are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's implied warranties. These dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers only.

90.    As a result of FCA's breaches of implied warranties, Plaintiffs and Class Members have suffered damages.

### FOURTH CAUSE OF ACTION
### Violation of Song-Beverly Consumer Warranty Act
### for Breach of Implied Warranty, Cal. Civ. Code § 1790, et seq.

91.    Plaintiffs, on behalf of the Class, incorporate all of the foregoing allegations into this cause of action.

92.    Class Vehicles are "consumer goods" and Plaintiffs and the proposed Class are "buyers" within the meaning of Cal. Civ. Code § 1791.

93.    FCA is a "manufacturer," "distributor," or "retail seller" under Cal. Civ. Code § 1791.

94.    The implied warranty of merchantability included with the sale of each Class Vehicle means that FCA warranted that each Class Vehicle: (a) would pass without objection in trade under the contract description; (b) was fit for the ordinary purposes for which the Class Vehicle would be used; and (c) conformed to the promises or affirmations of fact made on its container or label.

95.    The Class Vehicles would not pass without objection in the automotive trade because the Defect (as described herein) is present at the point of sale and causes their Cooling Systems to fail to heat, to cool and to properly defrost the windshield. As a result, the Defect makes them unfit for the ordinary purpose for which a Class Vehicle would be used.

96.    The Class Vehicles are not adequately labeled because their labeling fails to disclose the Defect that causes the Cooling System to fail to function as intended to heat, cool and defrost the windows of the Class Vehicles and does not advise the members of the proposed Class of the existence of the issue prior to experiencing failure firsthand.

97.    FCA's actions have deprived Plaintiffs and Class Members of the benefit of their bargains and have caused Class Vehicles to be worth less than what they paid.

98.    As a direct and proximate cause of FCA's breach of implied warranty, members of the proposed Class have received goods whose condition substantially impairs their value. Plaintiffs and members of the proposed Class have been damaged by the diminished value of their Class Vehicles.

99.    Under Cal. Civ. Code §§ 1791.1(d) and 1794, Plaintiffs and Class Members are entitled to damages and other legal and equitable relief, including at their election, the right to revoke acceptance of Class Vehicles or the overpayment or diminution in value of their Class Vehicles. They are also entitled to recover all incidental and consequential damages resulting from FCA's breach, as well as reasonable attorneys' fees and costs.

### FIFTH CAUSE OF ACTION
### Negligence

100.    Plaintiffs, on behalf of the Class, incorporate all of the foregoing allegations into this cause of action.

101.    FCA owed Class Members a duty of reasonable care to ensure that the Cooling System within the Class Vehicles would operate safely and properly for its reasonably anticipated use.

102.    FCA breached its duty by failing to ensure that the Pentastar engines used in Class Vehicles were free from the Defect. FCA also breached its duty by failing to warn Plaintiffs and Class Members that the Pentastar engines used in Class Vehicles were not free from the Defect or the safety hazards caused by it.

103.    As a direct and proximate result of FCA's negligence, sludge builds up in the Cooling Systems, damages engine and Cooling System components and eventually causes the Cooling Systems in Class Vehicles to fail, creating a safety hazard because they cannot be driven safely under all reasonably expected weather conditions and thus are not reliable for safe transportation. As a result, Plaintiffs and Class Members have suffered damages.

### SIXTH CAUSE OF ACTION
### Unjust Enrichment

104.    Plaintiffs, on behalf of the Class, incorporate all of the foregoing allegations into this cause of action.

105.    As described above, FCA sold Class Vehicles to Class Members even though the Cooling Systems installed in those vehicles are defective and pose a safety hazard, and failed to disclose its knowledge of the Defect and its attendant risks at the point of sale or otherwise. Furthermore, FCA charges for repairs of the Cooling Systems without disclosing that the Defect is widespread and that the repairs do not address its root cause.

106.    As a result of its fraudulent acts and omissions related to the defective Cooling System, FCA obtained monies which rightfully belong to Plaintiffs and Class Members to their detriment.

107.    FCA appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiffs and Class Members, who, without knowledge of the Defect, paid a higher price for their vehicles than those vehicles were worth. FCA also received monies for vehicles that Plaintiffs and Class Members who would not have otherwise purchased Class Vehicles had they been aware of the Defect.

108.    FCA's retention of these wrongfully-obtained profits would violate the fundamental principles of justice, equity, and good conscience.

109.    Plaintiffs and Class Members are entitled to restitution of the profits FCA unjustly obtained, plus interest.

## SEVENTH CAUSE OF ACTION
### For Violation of the California Consumer Legal Remedies Act
### Cal. Civ. Code § 1770 *et seq.*

110.    Plaintiffs, on behalf of the Class, incorporate all of the foregoing allegations into this cause of action.

111.    FCA is a "person" as defined by the CLRA. Cal. Civ. Code § 1761(c).

112.    Plaintiffs and Class Members are "consumers" within the meaning of the CLRA, as defined by Cal. Civ. Code § 1761(d), who purchased one or more Class Vehicles.

113.    The CLRA prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a).

114.    FCA has engaged in unfair or deceptive trade practices that violated Cal Civ. Code § 1770(a), as described above and below, by: (a) failing to disclose the Defect in the Class Vehicles; (b) representing that the Class Vehicles' factory-installed cooling systems had characteristics and benefits that they do not have (i.e. they functioned normally as intended and were not degraded by a Defect manifested by a chemical reaction between engine components and coolant installed by FCA that was present in the Class Vehicles at the point of sale; (c) by representing that a routine Cooling System flush would alleviate the effects of the Defect; (d) representing that the Class Vehicles' Cooling System was of a particular standard, quality, or grade when it is of another; and (e) advertising the Class Vehicles with the intent not to sell them as advertised. *See* Cal. Civ. Code §§ 1770(a)(5), (a)(7), (a)(9).

115.    FCA knew, should have known, or was reckless in not knowing that its Class Vehicles did not have the qualities, characteristics, and functions it represented, warranted, and advertised them to have.

116.    Plaintiffs and Class Members are reasonable consumers who expected that their Class Vehicles would work as represented.

117.    As a result of FCA's conduct and unfair or deceptive acts or practices, Plaintiffs and Class Members suffered actual damages in that the Class Vehicles do not

function as represented and is not worth the amount paid and FCA has deprived Plaintiffs and Class Members the benefits of their bargain.

118.    Plaintiffs and Class Members seek an order enjoining FCA's unfair or deceptive acts or practices, for other appropriate equitable relief, and for an award of attorneys' fees and costs under Cal. Civ. Code § 1780(e).

119.    Pursuant to Cal. Civ. Code § 1782(d), Plaintiffs reserve the right to amend this Complaint to include a request for damages under the CLRA pursuant to § 1782(a) of the CLRA within thirty days after the commencement of this cause of action for injunctive relief.

**EIGHTH CAUSE OF ACTION**
**Violation of the UCL**
**California Bus. & Prof. Code § 17200 *et seq.***

120.    Plaintiffs, on behalf of the Class, incorporate all of the foregoing allegations into this cause of action.

121.    California Bus. & Prof. Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." FCA's conduct related to the sale of its defective Class Vehicles violated each of this statute's three prongs.

122.    FCA committed an unlawful business act or practice in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, by their violations of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, as set forth above, by the acts and practices set forth in this Complaint.

123.    FCA committed unfair business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when it sold Class Vehicles that contained the Defect, and

when it represented that the Class Vehicles were in good working order and functioned as intended at the point of sale when in fact they did not.

124.    FCA committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when it affirmatively and knowingly misrepresented that the Class Vehicles, including the cooling system and related components, were in good working condition and functioned as intended at the point of sale when in fact they did not. Further, FCA committed fraudulent business practices by continuously recommending Cooling System flushes at owners' and lessors' expense knowing that this measure would not permanently alleviate the issues caused by a Defect which existed at the point of sale.

125.    As a direct and proximate result of FCA's unfair and deceptive practices, Plaintiffs and Class Members suffered and will continue to suffer actual damages.

126.    As a result of its unfair and deceptive conduct, FCA has been unjustly enriched and should be required to disgorge its unjust profits and make restitution to Plaintiffs and Class Members pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

127.    Legal remedies alone will be insufficient to fully redress the damages suffered by Plaintiffs and Class Members and will not stop FCA from continuing in its unfair and deceptive conduct. Therefore, Plaintiffs and Class Members seek equitable relief, including an order enjoining FCA's unfair or deceptive acts or practices, and an award of attorneys' fees and costs under Cal. Code of Civ. Proc. § 1021.5.

## **PRAYER FOR RELIEF**

Therefore, Plaintiffs seek judgment against FCA and relief as follows:

A.    An Order certifying this case as a Class Action;

B.      An Order appointing the Plaintiffs as the Class Representatives of the Class;

C.      An Order appointing Plaintiffs' counsel as Class Counsel;

D.      Damages and other relief under statutory or common law;

E.      Attorneys' fees and costs;

F.      Pre- and post-judgment interest;

G.      Declaratory, injunctive, and equitable relief; and

H.      Such other relief as is just and proper.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the proposed Class, hereby demand a trial by jury as to all matters so triable.

This the 4th day of April, 2018.

Respectfully submitted,

SIMMONS HANLY CONROY LLC

By: */s/ Crystal Foley*
Crystal Foley (SBN 224627)
cfoley@simmonsfirm.com
SIMMONS HANLY CONROY LLC
100 N. Sepulveda Blvd., Suite 1350
Los Angeles, CA 90245
Phone: (310) 322-3555

Mitchell M. Breit
*(pro hac vice* to be filed)
SIMMONS HANLY CONROY LLC
112 Madison Avenue
New York, New York 10010
(212) 784 -6400
mbreit@simmonsfirm.com

Gregory F. Coleman
(*pro hac vice* to be filed)
Adam A. Edwards
(*pro hac vice* to be filed)
**GREG COLEMAN LAW PC**
First Tennessee Plaza
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel: 865-247-0080
Fax: 865-522-0049
greg@gregcolemanlaw.com
adam@gregcolemanlaw.com


Daniel K. Bryson
(*pro hac vice* to be filed)
John Hunter Bryson
(*pro hac vice* to be filed)
**WHITFIELD BRYSON & MASON LLP**
900 W. Morgan Street
Raleigh, NC 27603
Tel: (919) 600-5000
Fax: (919) 600-5035
dan@wbmllp.com
hunter@wbmllp.com


Jack Landskroner
(*pro hac vice* to be filed)
**LANDSKRONER GRIECO MERRIMAN LLC**
1360 West 9th Street, Suite 200
Cleveland, Ohio 44113
Tel: (216) 522-9000
Fax: (216) 522-9007
jack@lgmlegal.com

*Attorneys for Plaintiffs*